**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA,

               v.                                  14-CR-133-A
                                                **DECISION AND ORDER**

JOSE ESCALERA
GIOVANNI COTTO,

            Defendants.

_____

After a jury trial, both Defendants were convicted of one count of retaliating against a witness in an official federal proceeding, in violation of 18 U.S.C. §§ 1513(b)(1), 1513(c), and 2. Specifically, both Defendants were found guilty of directing an assault on Anthony Maldonado, a witness in a federal criminal trial, in retaliation for Maldonado's testimony in that trial.[1]

At the final pretrial conference on July 5, 2017, the Government disclosed that one or both Defendants had spoken to a trial witness, Esteban Ramos-Cruz, when the Defendants and Ramos-Cruz were in the same area of the courthouse earlier that day. The Government alleged that the Defendants had attempted to intimidate Ramos-Cruz.

During trial, the Defendants moved to preclude evidence that they had allegedly attempted to "tamper[]" with Ramos-Cruz.[2] Docket No. 223 at 4-7. The Defendants argued that Federal Rules of Evidence 403 and 404(b) made such evidence inadmissible, as did the Sixth Amendment's Counsel Clause.

---

[1] Three Defendants were indicted in this case. Only two went to trial, however; the third, Charles Hecht, pled guilty. Thus, the Court uses the term "Defendants" to refer only to Jose Escalera and Giovanni Cotto.

[2] Ramos-Cruz testified that only Defendant Cotto made the statements at issue in the Defendants' motion. However, on July 10, Defendant Escalera orally joined in Defendant Cotto's motion.

1

During argument on the Defendants' motion the next morning, the Government disclosed that one or both Defendants had again spoken to Ramos-Cruz that morning. After hearing argument, the Court ordered an evidentiary hearing to help the Court understand the facts giving rise to the Defendants' motion and, in particular, their Sixth Amendment claim. At the hearing that afternoon, the Court heard testimony from Ramos-Cruz and Deputy United States Marshal Lee Eckenrode. Neither Defendant called any witnesses.

After the hearing the Court issued a brief oral ruling denying the Defendants' motion. The Court held that neither Rule 404(b) nor Rule 403 barred admission of the Defendants' statements. The Court also concluded that the Sixth Amendment did not preclude admission of the statements. Finally, the Court noted that it would file a written decision stating the reasons for its ruling in more detail.[3]

## BACKGROUND

As noted, Deputy United States Marshal Lee Eckenrode testified at the suppression hearing. Deputy Eckenrode has served in the United States Marshals Service (USMS) for seven years. Tr. 2:15-19.[4] As relevant here, Deputy Eckenrode was "in charge of managing the day-to-day affairs with respect to the defendants and the witnesses in this case." Tr. 2:24 – 3:1.

Deputy Eckenrode testified about how and when in-custody individuals are separated from each other, both inside and outside the courthouse. In the time leading up to trial in this case, the USMS held the Defendants at the Niagara County Jail, while

---

[3] This Decision and Order addresses only the Defendants' Sixth Amendment claim. The Court's oral ruling addressing the Defendants' Rule 403 and Rule 404(b) arguments remains the ruling of the Court.

[4] Citations to "Tr." refer to the transcript of the suppression hearing held on July 10, 2017. *See* Docket No. 224.

Ramos-Cruz was held in the Cattaraugus County Jail. Tr. 3:13 – 4:3. Deputy Eckenrode testified that, before trial began, the Government placed keep-away orders between the Defendants and the trial witnesses. Tr. 3:6-12. When the USMS transfers custody of prisoner to a local jail, that jail is "provided with paperwork that shows any keep-away, whether it's at that facility or another." 5:21-24. Thus, in this case, the Niagara County and Cattaraugus County Jails knew, or should have known, about the keep-away orders in place between the Defendants and Ramos-Cruz. Tr. 5:25 – 6:2.

Deputy Eckenrode testified that, "[f]or trial purposes," it is his "practice to bring the defendants [who] are on trial to the same floor where the trial is going to take place" (in this case, the ninth floor of the courthouse), while he places all in-custody witnesses on another floor, other than the fourth floor, where the USMS's main cellblock is located. Tr. 4:12-17. Deputy Eckenrode also testified that, on "[d]ays that don't involve trial, [the USMS] will only isolate somebody[] if necessary." Tr. 11:4-5. Finally, Deputy Eckenrode testified that, on the eve of trial, it is his practice to place defendants and trial witnesses "in . . . different cell[s] or isolation cell[s]" to "ensure[] that [defendants and trial witnesses] . . . ha[ve] no chance to speak or see each other." Tr. 21:3-13.

Deputy Eckenrode also very credibly testified that he did not place "witnesses near trial defendants [in this case] so that [he] could solicit incriminating statements." Tr. 13:2-5. Likewise, Deputy Eckenrode testified, no one from "the government," including the Assistant United States Attorneys who prosecuted this case, requested that he "intentionally place witnesses near the defendant[s] so [Government agents] c[ould] solicit incriminating statements." Tr. 13:6 -10.

3

As noted, Defendant Cotto made the statements at issue on two different days. The first statement was made on July 5, when the Defendants were brought to the courthouse for the final pretrial conference. The second statement was made on the morning of July 10, when the Defendants were brought to the courthouse for trial. Ramos-Cruz was also brought to the courthouse on those dates: On July 5 he was brought to the courthouse to prepare for trial, and on July 10 he was brought to the courthouse to testify.

The Court considers the events of each date in turn.

**1. The July 5, 2017 statements**

On July 5, the Defendants and Ramos-Cruz were all brought to the fourth floor of the courthouse. The fourth floor contains seven cells, five of which are located in "a linear cell block" with "one after the other right next to each other." Tr. 9:8-12. Each cell "easily" fits ten prisoners, and each has "a cage on the front," so "if you wanted to communicate from one cell to another, you could." Tr. 9:12-18. Prisoners are assigned to a particular cell based on the jail from which they came—thus, here, all Niagara County Jail prisoners were placed in two cells, while all Cattaraugus County Jail prisoners were placed in another cell. Tr. 9:10 - 25. On July 5, Ramos-Cruz was held in cell two, and the Defendants were held in either cell four or cell five. Tr. 8:20-9:2. Cell two is 20 to 30 feet from cells four and five. Tr. 10:8.

When the Defendants and Ramos-Cruz were together on the fourth floor, Ramos-Cruz testified that "[t]hey started [a] conversation" with him. Tr. 27:22. Specifically, Ramos-Cruz testified that Defendant Cotto told him that "what I was doing was wrong, that I knew he didn't have anything to do with this, that he was getting out

4

shortly and he had a daughter and that his attorney wanted to talk with me." Tr. 28:5-8. Ramos-Cruz also testified that Defendant Escalera "wasn't saying much," Tr. 28:17, and that Ramos-Cruz responded that he "would talk to [the Defendants'] attorneys so that they would leave me alone and would stop asking me questions." Tr. 28:20-22. Finally, Ramos-Cruz testified that no one from the Government asked him "to seek out information from either one of the[] [defendants]" or "to say anything or ask them questions." Tr. 28:23 – 29:5.

### 2. The July 10, 2017 statements

On the morning of July 10, transport vans from the Niagara County Jail and the Cattaraugus County Jail arrived at the courthouse's sally port at the same time. The Niagara County Jail transport brought the Defendants to the courthouse, while the Cattaraugus County Jail transport brought Ramos-Cruz and Anthony Maldonado, the victim in this case.[5]  Tr. 4:24 – 5:15.

Deputy sheriffs from both jails escorted their prisoners—at the same time—into the courthouse's prisoner elevator. Tr. 4:25 – 5:8. Thus, despite the existence of keep-away orders between the Defendants and the witnesses in this case, and despite the events of July 5, the Defendants and Ramos-Cruz were in the same elevator at the same time. Tr. 6:9 – 6:19. Ramos-Crus testified that, when he arrived at the sally port, he told the deputy sheriffs who were escorting him that he "could not be put in [the elevator] together" with the Defendants "because [he and Maldonado] were going to be testifying against them." Tr. 29:8-11. Nonetheless, Ramos-Cruz testified, the deputy sheriffs "didn't pay attention . . . and . . . still put us together." Tr. 29:8-12.

---

[5] The record does not show whether the transports from the Niagara County Jail and the Cattaraugus County Jail brought any other prisoners to the courthouse on July 10.

5

When they were in the elevator together, Ramos Cruz testified, Defendant Cotto asked Ramos-Cruz whether he "was here to make a deal." Tr. 29:12-13. Ramos-Cruz responded that he was not. Tr. 29:13. Ramos-Cruz further testified that Defendant Cotto began the conversation and that Defendant Escalera did not say anything. Tr. 29:22-30:5. Finally, Ramos-Cruz again testified that nobody associated with the Government asked him to "seek out information about Mr. Escalera or Mr. Cotto." Tr. 30:21-25. Ramos-Cruz and Maldonado were eventually taken to the floor on which they would be held pending their testimony, while the Defendants were taken the ninth floor. Tr. 7:8-20.

**DISCUSSION**

Once the Sixth Amendment right to counsel attaches, as it had on the dates in question here, "the Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel." *Michigan v. Harvey*, 494 U.S. 344, 348 (1990) (quotation marks omitted). This rule applies to statements made to "identified police officers" as well as "'undercover agent[s]'" whom the Government uses "'to circumvent the Sixth Amendment right to counsel.'" *United States v. Jacques*, 684 F.3d 324, 330 (2d Cir. 2012) (quoting *Illinois v. Perkins*, 496 U.S. 292, 299 (1990)).

This rule has important limits, however. The Government violates the Sixth Amendment only when it engages in conduct whose *purpose* was to obtain an incriminating statement. That is, "a defendant does not make out a violation of [his Sixth Amendment] right simply by showing that an informant, either through prior arrangement or voluntarily, reported [the defendant's] incriminating statements to the

6

police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). Put simply, "the Sixth Amendment is not violated whenever—by luck or happenstance—the [Government] obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). Instead, to make out a Sixth Amendment right-to-counsel claim, a defendant must show that the Government used "investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann*, 477 U.S. at 459. Thus, the Sixth Amendment is not violated when the Government obtains and uses "evidence of an accused's statements to a jailhouse informant who was 'placed in close proximity but [made] no effort to stimulate conversations about the crime charged.'" *Id.* at 456 (quoting *United States v. Henry*, 447 U.S. 264, 271 n.9 (1980)).

This settled case law resolves the Defendants' Sixth Amendment argument for three reasons.

First, the evidence introduced at the suppression hearing did not show that the Government engaged in any sort of intentional effort to obtain incriminating statements from the Defendants. The Sixth Amendment, as noted, prevents the Government from benefiting at trial from "some action" on its part "that was designed deliberately to elicit incriminating remarks." *Kuhlmann*, 477 U.S. at 459. "[D]eliberate elicitation under the Sixth Amendment 'covers only those statements obtained as a result of an *intentional* effort' on the part of government officials to secure incriminating statements from the

7

accused." *United States v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007) (quoting *United States v. Stevens*, 83 F.3d 60, 64 (2d Cir. 1996)) (emphasis in *Rommy*).

The evidence introduced at the hearing did not show an intentional effort to elicit incriminating statements from the Defendants. As to the July 5 statement, Deputy Eckenrode testified that the USMS cellblock attendant "honored" the keep-away order that was in place between the Defendants and Ramos-Cruz, but that he did not follow Deputy Eckenrode's eve-of-trial practice, which would have been to put the Defendants "in a different cell or isolation cell[s]" to "ensure[] that they had no chance to speak or see each other." Tr. 21:9-13. Thus, at most, the evidence showed a failure to implement a best practice and, perhaps, a failure to put in place a "sight and sound" keep-away order. As to the July 10 statement, Deputy Eckenrode testified that the deputy county sheriffs who transported the Defendants and Ramos-Cruz to the courthouse had (or should have had) knowledge of the keep-away orders that were in place but that the deputies failed to follow those orders. Indeed, Ramos-Cruz testified that, on July 10, a deputy county sheriff disregarded Ramos-Cruz's efforts to avoid being in the elevator together with the Defendants. However, a careless decision to place the Defendants and Ramos-Cruz in close proximity to each other is not the same as "an intentional effort on the part of government officials to secure incriminating statements from the accused." *Rommy*, 506 F.3d at 135 (quotation marks omitted). It is regrettable that the Defendants and Ramos-Cruz were placed near each other on two occasions, and it was certainly preventable. But it is a stretch to argue that it was intentional, much less that it was part of a deliberate effort to elicit incriminating statements from the Defendants.

8

Second, and relatedly, there is no Sixth Amendment violation where there is no evidence that a government informant was "instructed by the [government] to get information about the particular defendant[s]." *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997). Here, Ramos-Cruz credibly testified that no Government agent asked him to "seek out information from one of the[] [Defendants]." Tr. 28:23 – 29:5. *See also id.* at 30:21-25. Thus, the circumstances surrounding both statements show that the Government did not obtain the statements by using "the equivalent of direct police interrogation." *Kuhlmann*, 477 U.S. at 459.

Finally, the Defendants' Sixth Amendment argument is without merit because the evidence showed that, on both July 5 and 10, Ramos-Cruz was primarily a passive listener.[6] That it, Ramos-Cruz did not elicit any incriminating statements from the Defendants. To the contrary, the evidence showed that, on both occasions, *Defendant Cotto* began the conversation between himself and Ramos-Cruz. "[T]here is no [Sixth Amendment] violation in the absence of solicitation." *Birbal*, 113 F.3d at 346.

In short, the evidence showed only that Defendant Cotto chose to speak to a trial witness when they were, unfortunately, placed together. "The Sixth Amendment rights of a talkative [defendant]," however, "are not violated when" a witness merely listens to a defendant and recounts what he heard "without having been deputized by the government to question that defendant." *Id.*

The Defendants' motion to suppress Defendant Cotto's July 5 and July 10 statements on Sixth Amendment grounds is, therefore, without merit.

---

[6] Ramos-Cruz testified that he responded to Defendant Cotto's statements, but he did not respond in a way that would draw out more incriminating statements from Defendant Cotto. Tr. 28:20-22; *id.* 29:12-13.

9

## CONCLUSION

For the reasons stated above, as well as those stated on the record on July 10, 2017, the Defendants' motion to preclude evidence of Defendant Cotto's statements to Esteban Ramos-Cruz on July 5, 2017 and July 10, 2017 is denied.

**SO ORDERED.**

Dated: August 30, 2017                             *s/Richard J. Arcara*
    Buffalo, New York                      HONORABLE RICHARD J. ARCARA
                                               UNITED STATES DISTRICT JUDGE